STATE ex rel. PERRY v. BOARD OF COM'RS OF FOURTH JEFFERSON DRAINAGE DIST. et al.*

No. 14717.

Court of Appeal of Louisiana. Orleans.

Nov. 27, 1933.

*Rehearing denied January 2, 1934. Writ of certiorari denied by Supreme Court February 26, 1934.

LeDoux R. Provosty, of Alexandria, and Dart & Dart and H. Grady Price, all of New Orleans, for appellant.

Milling, Godchaux, Saal & Milling and Nat B. Knight, Jr., all of New Orleans, for appellee.

JANVIER, Judge.

The facts which gave rise to this controversy are in dispute only in certain comparatively unimportant details.

The Fourth Jefferson drainage district of the parish of Jefferson, with legal authority and as the governing body of the subdrainage district No. 3, issued certain bonds which were sold to the general public and which were to be paid in principal and interest by taxes levied against the property within the said subdrainage district. We shall hereafter refer to the said drainage district and to the commissioners thereof as "The District."

In May, 1932, of the bonds originally issued, there were outstanding a total in face value of $2,394,000. At that time the district was in default in the payment of both principal and interest and, as the result of the default, there was formed a bondholders protective committee, to which we shall hereinafter refer as "The Committee."

Of the outstanding bonds, all except those representing a face value of $76,000 had been deposited with the committee, or had been placed under its control.

Of the bonds which were not under the control of the committee, twenty, of the face value of $1,000 each, were held by the relator, to whom we shall hereinafter refer as "Perry."

It developed that there was available as the total tax collection for the retirement of bond coupons maturing in 1932, only $68,542.02, whereas there was required $143,640 to pay all of the coupons on the outstanding bonds, since the said bonds bore interest at 6 per cent. per annum.

Negotiations between the committee and the district, and in which Perry took no part, led to an agreement as the result of which $4,560 was deducted from the said total available fund of $68,542.02, and the balance, $63,982.02, was paid over by the district to the committee to be by the committee distributed among the various bondholders represented by it.

The said sum of $4,560 was then deposited in a bank, which is still solvent, and which still has the fund available. The deposit was made under an agreement which provided that withdrawals could be made only upon the joint order of the district and the committee. It will be at once noted that the amount placed to the credit of the joint account, to wit, $4,560, is exactly 6 per cent. on $76,000, which latter figure represents the face value of the bonds which were not controlled by the committee.

When the balance of the fund, to wit, $63,982.02, was paid over to the committee for distribution among the bondholders represented by it, the committee surrendered to the district and the district canceled all of the 1932 coupons which had been attached to those bonds which the committee controlled.

Perry contends that there is in the fund of $4,560 enough to pay in full all of the outstanding 1932 coupons which have not been surrendered and canceled and he seeks, by mandamus, to compel the committee and the district to draw the necessary check or checks to pay to him out of that fund $1,200, since he is the owner and holder of twenty bonds of the face value of $1,000 each, to each of which is attached two coupons for $30 each, due in 1932.

In the court below the prayer of relator

was granted and the respondents were ordered to draw the necessary check or checks. The committee alone has appealed.

There are two major defenses on which the committee relies in refusing Perry's request: First, it is maintained that mandamus will lie to compel the performance of only a plain ministerial duty and it is contended that, even in the district there is, under the circumstances, no plain ministerial duty to pay Perry's coupons in full, and, second, it is asserted that there is no relationship, either contractual or legal, between Perry and the committee which creates in Perry the right to institute mandamus proceedings against the committee—in other words, that no privity of any kind exists between Perry and the committee.

There is evidence in the record which was adduced for the purpose of showing the reason which actuated the committee and the district in depositing the sum of $4,560. The committee contends that it was not the purpose of the parties to that agreement to provide for the payment in full of those coupons which were not controlled by the committee, and Perry, on the other hand, interprets the contract as an agreement that those bondholders, who were not parties to the agreement, might on demand receive the full face value of their coupons. It may be well to mention that the fund which was turned over to the committee for distribution among those bondholders represented by it was sufficient to pay to each of such bondholders only about 40 per cent. of the amount due on each coupon.

Mr. McCaleb, who, as attorney for the district, had taken a leading part in the negotiations with the committee, was plainly of the opinion that the agreement contemplated payment in full to Perry and to others who were not parties to the agreement. His testimony on that subject is as follows:

"Q. Do you remember when I, Mr. Milling, demanded from the Drainage Board payment of the 1932 interest coupons due Mr. Perry? A. Yes, sir.

"Q. Did you not tell me then that the money was available for the purpose of paying these coupons? * * * A. I told you, Mr. Milling, that there had been set aside four thousand, five hundred and sixty dollars to take care of the payment of cases such as your bondholders, who had not deposited their bonds with the Committee.

"Q. Mr. McCaleb, did you not state to me that the Drainage District was willing to pay the amount if we could get the Bondholders' Protective Committee to sign the check? A. Yes."

An examination of the contract and a study of the testimony with reference to the negotiations which led up to it cannot fail to show that the district authorities felt that, although they were within their rights in making a compromise agreement with the committee, they could not thereby affect the rights of any coupon holders not represented by the committee. And manifestly they could not. They recognized the obvious fact that the fund in their possession could be devoted but to one purpose, the retirement of the 1932 coupons; and they further saw that, if any coupon holders were willing to accept a compromise settlement of their claims, even though other coupon holders not parties to such compromise agreement might, as the result thereof, be benefited, nevertheless, those others were entitled to those benefits and could not be made to accept anything less than the full amount due them.

When the committee surrendered and permitted the cancellation of all the coupons represented by it, it wiped out of existence all the claims against the fund except those held by the bondholders who were not represented by it. There is no pretense that there are any other claims against that particular fund than those held by Perry and those other coupon holders whose claims have not been compromised by the committee.

We find, then, that there is a fund which by law is dedicated to a particular purpose—the payment of coupons—and that there remains in the fund a sufficient amount to pay in full all who were entitled to make claim thereon. There is, then, a plain ministerial duty in the custodian of that fund to make payment.

The district is governed and controlled by the laws of the state of Louisiana, and particularly by Act No. 85 of the Extra Session of the Legislature of 1921, which, in section 48, provides:

"A sufficient amount of the Drainage Tax shall be appropriated by the Board of Commissioners for the purpose of paying the principal and interest of the said bonds, and the said taxes, when collected, shall be preserved in a separate fund for that purpose and no other. * * *

"The said Board of Commissioners shall cause to be deposited at the place of payment sufficient funds to pay the maturing bonds and coupons when due. * * * "

There was no right in the district to provide that its funds could be checked upon by any other board or body, for, in the same act, in section 16, we find:

"Funds of the District shall be withdrawn or paid out only on warrants or checks of the Board of Commissioners signed in the manner provided by the Board of Commissioners."

But it is said that the physical power to draw against the said fund has been lost as

a result of the contract under which the committee was given joint control over the fund.

There was, however, no legal right in the district to restrict or limit its own power and control over its funds, for, in section 16 of the act from which we have above quoted, the words "signed in the manner provided by the Board of Commissioners" surely cannot be interpreted as giving to the board, or, as we have called it, the district, the right to restrict its own power to draw against its own funds by giving to some one else, or some other board or body, the right of joint control. The words "signed in the manner provided by the Board of Commissioners" simply mean that the board of commissioners shall designate one or more of its officials whose signatures shall be necessary on its checks, but does not mean that it may designate some other person, or some other board not connected with the board of commissioners of the district.

When the committee entered into a contract under which it assumed partial control of the funds of the district, since it is charged with knowledge of the law, it is to be assumed that it was cognizant of the fact that it was undertaking a duty which, under the law, it could not exercise. In other words, that portion of the contract was of no effect, it was a complete nullity. And the fact that it was a nullity gives us much concern, because we find it difficult to convince ourselves that, if the said contract giving to the committee joint control over the fund is a nullity, we should, by mandamus, compel the committee to sign the check which Perry desires because to sign such check is to exercise joint control, which we believe the committee has no right to exercise.

But the solution lies in the fact that the committee cannot be heard to refuse to sign the check on the ground that the contract is illegal. It must be assumed that, when it entered into the contract under which it undertook to exercise joint control over the fund, it intended that checks properly drawn against the said fund would be signed by it. We find that the check which Perry now desires should be properly drawn against the said fund and we feel that the committee cannot be heard to refuse to sign the check and to base its refusal on the illegality of its own contract. Since, as a result of that contract, the fund is now in a bank which may be justified in refusing to honor any check, unless signed by both parties, it follows that the committee cannot derive the benefit and protection of the contract and, at the same time, refuse to carry out the provisions which it may consider onerous.

We feel that mandamus could have been resorted to to compel the district to make payment had the funds remained under its exclusive control, for, under the facts which have been shown, there was a plain ministerial duty in the district to do so. There is no doubt whatever that a public board or commission, which has collected money which by law is dedicated to a particular purpose, may, by mandamus, be compelled to devote that money to that purpose. In 2 Bailey on Habeas Corpus and Special Remedies, page 1065, appears the following:

"Mandamus is the appropriate remedy to compel municipal authorities to pay to a 'bona fide' holder of municipal bonds the money that has been collected pursuant to law for the purpose of meeting the payment of such obligations, where such authorities refuse."

In State ex rel. Carondelet Canal & Nav. Co. v. Pilsbury, Mayor, 30 La. Ann. 705, is found a very interesting case in which the Supreme Court of Louisiana held that mandamus is the proper method by which municipal authorities may be compelled to devote to the payment of judgments against the municipality, moneys which are, or should be set apart into a special fund and devoted to that purpose. In that opinion is found the following paragraph:

"No one contends for, and all the authorities forbid, resort to the writ of mandamus where nothing is to be accomplished by it; and it is in general true that if a corporation or officer whose duty it is to pay money hasn't it that is sufficient answer to the writ. Moses, however, lays down the rule to be, and we think it is correct, that 'if one whose duty it is under the law might have had funds had he not misapplied them, he is as much bound to pay as if he had them. Therefore, when public moneys are raised by taxation for specific purposes and placed in the hands of the county' (for which we may here read the city) 'treasurer, to be paid out on the orders of certain auditing boards, and the treasurer pays out the money for other purposes than those for which the money was raised, he may, notwithstanding, be compelled to pay the order drawn on him to satisfy claims for which the money was raised;' and he cites a number of authorities in support of this proposition of common sense and common honesty."

The "Moses" referred to is the well known author of the treatise on mandamus.

In State ex rel. Globe Const. Co. v. Town of Plaquemine et al., 175 La. 69, 143 So. 7, a contracting company sought by mandamus to compel a municipality to levy an assessment and to devote the proceeds to the pay-

ment of the relator's claim for the contract price of laying certain sidewalks.

It was contended that such extraordinary remedy could not be availed of since "mandamus is not a proper proceeding to collect a debt. * * *" While the court did not discuss the question of the right to compel by mandamus the payment to relator of such amount as was to be collected, it did hold that the relator could force the levying of the assessment, and by inference held that after the funds had been collected by the municipality, payment thereof to the contractor might be enforced by mandamus. The court held that after making collection of such taxes, or such special assessments as are, by law, dedicated to a particular purpose, a municipality which makes the collection has no discretion as to the disposition thereof, and, therefore, may be compelled by mandamus to pay over such collections to those who are entitled thereto.

■ Since the district might have been compelled by mandamus to make payment for Perry's coupons, and since the claim of the committee to the right of joint control comes, if it comes at all, through the district, it, the committee, cannot be heard to interpose a defense which was not and is not available to the district.

■ There is manifestly no adequate remedy at law available to Perry. The fund is in the possession of the district and of the committee and, if mandamus may not be availed of, and ordinary legal procedure must be resorted to, the fund may be withdrawn or devoted to other purposes long before a final judgment at law can be rendered.

If the contract between the committee and the district must first by legal process be set aside and annulled and then another suit brought against the district alone, months would elapse before the relator could obtain the result to which he is now entitled.

■ We find no merit in the contention that, since the committee is neither an individual nor a corporation, mandamus will not lie to compel the members thereof to act. This contention is based on a too narrow construction of article 829 of the Code of Practice, under which article mandamus is defined and in which it is declared that mandamus "is an order * * * addressed to an individual or corporation, or court of inferior jurisdiction. * * *" It is contended that the right to mandamus should not be freely extended, but should be limited to those persons and to those cases specifically provided by law. But we do not think that the word "individual" can be so strictly lim-

ited as relator contends it should be. The committee is a group of individuals. Had the joint control contract been entered into by any one of the individuals composing the committee, the contention now made by the relator would manifestly have been groundless. We believe that, where one person may be compelled by mandamus to do an act which is purely ministerial, the fact that two or more persons combine to do the act cannot shield those persons and prevent the enforcement by mandamus of the rights of other parties. The committee is a group of individuals; it has made of itself an entity and has done an act which, if done by an individual, would subject the individual to the processes of the court enforceable through mandamus. The committee is, therefore, subject to the same process as the individual would have been.

The judgment appealed from is affirmed at the cost of respondent.

Affirmed.

WESTERFIELD, Judge.

I believe that the plaintiff's claim should be paid out of the impounded funds, but I also believe that the contract under which the board attempted to surrender the control of public money to the bondholders' committee was an absolute nullity and that a mandamus is not the proper remedy.